PRESS PUB. CO. v. MONTEITH.

(Circuit Court of Appeals, Second Circuit. July 16, 1910.)

No. 249.

1. APPEAL AND ERROR (§ 1058*)—CURE OF ERROR—EXCLUSION OF TESTIMONY.
Any error in excluding a question whether witness knew plaintiff and her general reputation was cured by permitting him to state on the next question that he did not know her general reputation.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4200–4206; Dec. Dig. § 1058.*]

2. APPEAL AND ERROR (§ 1058*)—CURE OF ERROR—EXCLUSION OF TESTIMONY.
Any error in excluding a question whether witness knew plaintiff's reputation in the community was cured by permitting him to state on the next question that he never heard her word disputed as to truth.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4200–4206; Dec. Dig. § 1058.*]

3. LIBEL AND SLANDER (§ 110*)—PLAINTIFF'S CHARACTER—EVIDENCE.
A question asked a witness as to the general character of plaintiff in libel not limited to a time at and prior to the publication was properly excluded.
[Ed. Note.—For other cases, see Libel and Slander, Dec. Dig. § 110.*]

4. APPEAL AND ERROR (§ 260*)—OFFER TO PROVE—EXCEPTIONS.
The aggrieved party should except to a rejection of an offer to prove in order to preserve the ruling for review.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1503–1515; Dec. Dig. § 260.*]

5. LIBEL AND SLANDER (§ 103*)—IRRELEVANT TESTIMONY.
In a libel suit for insinuating that a child cared for by plaintiff was born to her out of wedlock, testimony that plaintiff "waywardly held out the impression in the community that there was a mystery about this

child" was properly rejected as being incompetent, where communication of the declaration to defendant was not shown.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 281; Dec. Dig. § 103.*]

6. LIBEL AND SLANDER (§ 103*)—EVIDENCE—ADMISSIBILITY.

In a libel suit for charging abuse of her child, one who saw her before and after the publication could testify that she was healthy, robust, rosy cheeked, and full of spirits, though the testimony covered a period extending more than two weeks beyond the publication.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 281; Dec. Dig. § 103.*]

7. LIBEL AND SLANDER (§ 124*)—INSTRUCTIONS.

In a libel suit for charging abuse of a child, it was not error to instruct that it was for the jury to say what weight should be given to the facts that the child appeared to be healthy and her relations with plaintiff affectionate, where the jury had observed the child in court, though the trial occurred several years after the publication.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 365–373; Dec. Dig. § 124.*]

8. APPEAL AND ERROR (§ 1032*)—ERROR—PREJUDICE NOT PRESUMED.

Prejudice from error should be shown and not presumed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4047–4051; Dec. Dig. § 1032.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Action by Laura W. Monteith against the Press Publishing Company. Judgment for plaintiff for $15,000, and defendant brings error. Affirmed.

Howard Taylor (John M. Bowers and W. H. Van Benschoten, of counsel), for plaintiff in error.

Olney & Comstock (J. Noble Hayes, of counsel), for defendant in error.

Before LACOMBE, COXE, and WARD, Cicuit Judges.

COXE, Circuit Judge. The plaintiff, Laura W. Monteith, is a lady of refinement, culture and gentle lineage whose ancestors have occupied "Heathcote Farm" at Kingston, New Jersey, since 1737. Prior to leasing the farm she had been engaged in teaching young ladies and preparing them for college. She had traveled extensively and spoke five languages. She was acquainted with the best people in the locality and entered into the society of the university town of Princeton, numbering among her friends such people as Ex-President Cleveland and Dr. Van Dyke. In April, 1900, she married Col. Walter S. Monteith, a member of the bar of Columbia, South Carolina, and lived with him at the Heathcote farm, until December 8, 1903, when he left her and returned to South Carolina. In February, 1900, she took a lease of the Heathcote farm from the executors of her father's estate and was endeavoring to make it a success as a dairy farm but with indifferent results.

About two years after the marriage Mrs. Monteith went to New York and brought back with her the little girl, Pearl, whose treatment while at Heathcote farm caused the publication which is the subject of the present controversy. The foregoing brief introduction is necessary to a full understanding of the article which is too long to quote in full. The article seems to have been written by the reporter without any personal animosity towards the plaintiff but rather in response to the morbid demand of a degenerate public for sensational and scandalous literature. It was probably the product of that false and abhorrent code of newspaper ethics which sanctions the rule—"Publish first and investigate afterwards." However this may be, it requires only a casual perusal of the article to convince the reader that its author, not only by direct and brutal statements, but more particularly by insinuations and innuendoes, which he has taken little pains to veil, has held the plaintiff up to the public as a monster of cruelty and immorality. Those who did not know her would, after reading the article, set her down as a pariah to be avoided by all decent folk; in short, the effect of the article was to destroy her reputation. . Take, for instance, the following:

"Went to Europe.

"Shortly afterward, she was absent for a year or more and Kingston heard that she was on a visit to Europe. When she returned she brought with her a baby not many months old, and that baby grew up to be the eerie, doll-like Pearl. To the neighbors, Mrs. Monteith said that the child had been given to her by a New York woman. To other neighbors she said that she had adopted the child from a New York institution. But who the woman was, or what institution it was, she has never told anybody, not even her own mother. The man who was to become her husband entered the scene about a year later."

The innuendo here is so brutally plain that it is admitted by the author of the article and no justification is attempted. It insinuates that the plaintiff before her marriage, became the mother of a child. Not only was the inference false but the details were untrue also. Pearl, when she came to Kingston, was a little girl walking by the plaintiff's side, not "a baby not many months old." She came there not when the plaintiff was a single woman but two years after she had married Monteith. The plaintiff had not been to Europe and did not inform any one that she had been. When she brought Pearl back her journeying consisted of a trip to New York and return. In short, the author of the article in order to make the inference of unchastity too plain to be mistaken did not hesitate to resort to anachronisms and the substitution of fiction for fact. Here, then, we have the most infamous charge which can be made against a virtuous woman, without a word of proof to justify its publication.

The article stated further that upon the division of the family, after the death of the father, the plaintiff "with a romantic turn and a love for admiration went on the road with a theatrical troupe." It charges her with extravagance "which fairly took the husband's breath away." It asserts she never paid her servants in full, was sued by them for their wages and that her interest in the estate "was plastered over with judgments."

It brands her as a monster of cruelty having no counterpart in history and few in fiction. It says that she knocked the little girl down, blackened her eye, locked her in a cold room at night with the thermometer 15 degrees below zero and frequently "beat her unmercifully with a six-foot horsewhip and the child's body was marked with black and blue spots." It states that on one occasion the plaintiff was seen to "Beat little Pearl like a carpet." It also charged that the little girl was brutally starved by the plaintiff and was even denied bread, that the child was always hungry and begging for food. The following will serve as an illustration. The article says that a servant in the Monteith household swore as follows:

"About 11 o'clock the child came down to the kitchen and asked for a piece of bread. 'You shan't have one piece of bread,' Mrs. Monteith cried. 'Get upstairs now in a hurry!' 'Mamma, please give me a piece of bread, I am so hungry!' pleaded the little girl. Without answering, Mrs. Monteith kicked her and knocked her down. The child screamed, and Mrs. Monteith grabbed a napkin and held it over her mouth and beat her with her fists and kicked her again. I jumped between them and told Mrs. Monteith to stop. Pearl was hurt so she had to pull herself up by a chair from the floor and then Mrs. Monteith sent her upstairs. Mrs. Monteith followed her with a horsewhip. I heard Pearl screaming and called my husband and sent him upstairs."

The article says that these charges were made in affidavits but, with one unimportant exception, the record shows that they were neither signed nor sworn to.

These, briefly stated, are the charges against the character and reputation of the plaintiff made by the defendant. Accusations more serious could hardly be made against a woman. If true, she was a moral leper whose inhuman treatment of defenseless youth recalls the savagery of Dotheboys Hall. But the charges were not true. Many of them were concededly false and as to those regarding which there was a conflict upon the evidence, the jury found for the plaintiff.

The first proposition argued by the defendant deals with assignments of error from 8 to 11 inclusive.

A witness called by the defendant was asked, "Do you know Mrs. Monteith and her general reputation?" The question was duly objected to. The objection was sustained and an exception noted.

The next question and answer were as follows: "Do you know her general reputation? I do not." Clearly the answer applied to the first as well as to the second question and destroyed any force the exception might have had. In legal effect the previous ruling was reversed and the witness was permitted to answer the question. Another witness for the defense was asked, regarding the plaintiff, "You know her reputation, do you not, in the community?" This was duly objected to, the objection was sustained and the defendant excepted. This exception was also rendered innocuous by the answer to the next question, "I never heard her word disputed, as far as truth is concerned. I never heard that she was anything but a truthful woman, and the only trouble that I ever"—here he was reminded by the court that he should not digress from the question which was "Do you know her reputation for truth and veracity?" The witness continued

"I should say she was all right as far as truth was concerned." After a brief cross-examination the court adjourned and upon reassembling the next morning the defendant's counsel presented an authority which he insisted sustained his contention regarding the admissibility of testimony as to the general character of the plaintiff. The court however adhered to his former ruling. Counsel for defendant then said:

"It may be considered then that upon the trial the defendant offered to prove the general character and reputation of the plaintiff in the community in which she lived, which evidence was ruled out and an exception taken, on the ground it was incompetent, irrelevant and immaterial.

"The Court: Yes."

It will be noticed that the witness was not recalled and no new offer was made to prove the general reputation of the plaintiff. Counsel was merely calling the attention of the court to what had taken place on the preceding afternoon, in order that there should be no misunderstanding as to the actual occurrence. The sum and substance of it all is that the court adhered to his ruling of the day before. An examination of the question which occasioned the discussion makes it plain that the ruling was correct; principally because the question did not ask for the knowledge of the witness as to plaintiff's general character and was not limited to a time at and prior to the publication. Counsel for the defendant argue that the statement above quoted should be "treated as an offer to prove by witnesses, who had knowledge of the general character of the plaintiff in the community, what that general character was at the time of and before the libel." A very serious objection to this contention, assuming it to be otherwise tenable, is that no exception was taken to the ruling. But we are convinced that it was not the intention of the judge to exclude legitimate testimony as to the plaintiff's general character; on the contrary the widest latitude was allowed, the inquiry even extending to her financial standing and the petty complaints of discharged employés.

The eighteenth assignment of error deals with the exclusion of testimony so manifestly incompetent and irrelevant that a mere statement of the facts is sufficient to demonstrate the correctness of the ruling. The defendant proposed to show by Mrs. May W. Hicks that after the publication of the libel she had a conversation with the plaintiff in which the latter "waywardly held out the impression in the community that there was a mystery about this child." Counsel disclaimed any purpose to show that the conversation was ever communicated to the writer of the libelous article. There is not a shadow of doubt in our minds that the court properly excluded the testimony. Sun Ass'n v. Schenck, 98 Fed. 925, 40 C. C. A. 163.

For similar reasons the objection to the question put to the plaintiff upon cross-examination, relating to the same conversation with Mrs. Hicks, was also properly sustained.

The testimony of Mrs. McPherson who saw Pearl in the summer of 1905, before and after the publication of the libel, which was on the 13th of August, was perfectly competent, even though her description of Pearl's condition extended into September. It was for the jury to say whether the "healthy, robust child—rosy cheeks—full of

spirits" which the witness saw in September could, in August, have been the starved and cowering creature which the article described. It was not conclusive, of course, but it was evidence.

These are all the exceptions to the admission or rejection of testimony which have been argued. It must be admitted that they are few in number when it is considered that the trial lasted more than a week and was fiercely contested at every turn.

The court charged the jury as follows:

"You are entitled on this whole matter to take into consideration what you have observed in the courtroom; what Mr. Hayes has called Exhibit 1, that is, the little girl herself. It is for you to say. She looks like a healthy child. Her relations with Mrs. Monteith seem affectionate. It is for you to say what weight should be given to that."

This was excepted to by the defendant. We find no error in the charge. The language used was, perhaps, unnecessary, for it stated a self-evident proposition, known to every member of the jury. For eight days the plaintiff and Pearl had been in court together and we can see no impropriety in telling the jury that they might do what they could not avoid doing, viz.: observe the child and her actions in court. She was sworn as a witness, her testimony covering five printed pages.

If it were error to tell the jury that they might look at Pearl it follows that it was error to permit her presence in the courtroom, and no one contends for so absurd a proposition. Suppose she had been left at home. It is easy to picture the defendant's counsel, after describing the plaintiff's alleged cruelties, facing the plaintiff's counsel and triumphantly demanding—"Where is little Pearl? Why has she not been produced? If she regards the plaintiff with the filial affection depicted by counsel, why is she not here that you may judge for yourself? Her absence points to but one conclusion."

The appeal would have been legitimate and the question difficult to answer. The plaintiff's counsel was not justified in taking the risk of trying the case in the absence of Pearl. As she was properly in court counsel on both sides might legitimately comment on her presence and draw such inferences from her appearance and conduct as the occasion justified. The judge too was well within his rights when he used the language which is the subject of criticism.

As before intimated, his instruction was unnecessary and yet it is customary in sharply contested trials to hear the statement from the bench "You have seen the witnesses, gentlemen, you have observed their demeanor in court and you have a right to take these matters into consideration in determining what credence you will give to their testimony."

We are not familiar with a case where an appellate court has reversed a judgment because such language was used by the trial judge. Of course the trial took place several years after the publication in the World, of course the child was older than when the cruelties were alleged to have taken place, but these facts were as patent to the jury as to the judge and he was not called upon to enter into details so collateral and minute that a mere statement of them would imply a re-

flection upon the intelligence of the jury. We think he was justified in assuming that the jury was composed of men of ordinary capacity who might fairly be trusted to draw an inference from the facts as they appeared in court, especially as one of the most intelligent witnesses had testified regarding Pearl—"She looked the same in August, 1905, as she looks now." In other words, if they found Pearl to be a bright, healthy, happy girl, on affectionate terms with plaintiff, they might take these facts into consideration in determining whether the same Pearl was starved and beaten by the plaintiff three years before.

Other exceptions to the charge were taken but we do not consider it necessary to discuss them in detail. We are convinced that the charge fairly and impartially states the facts and the law applicable thereto and that every member of the jury must have understood his duty when he entered the jury room.

The defendant realizing, apparently, that even upon its own presentation no very serious error has been committed invokes the archaic rule that if error be discovered, no matter how trivial, prejudice must be presumed. The more rational and enlightened view is that in order to justify a reversal the court must be able to conclude that the error is so substantial as to affect injuriously the appellant's rights.

Prejudice must be perceived, not presumed or imagined.

The writer, speaking only for himself, is in hearty accord with the modern tendency.

The object of all litigation should be to arrive at a just result by the most direct, speedy and inexpensive proceedings. If such a result can be reached by absolutely inerrant methods so much the better, but while the administration of justice is in the hands of merely finite beings, such perfection can hardly be expected. I venture to think that no long continued, hotly contested trial can be conducted to a conclusion without mistakes being committed. Few minds are so constituted that they can grasp at the outset all the ramifications of a complicated controversy and, before the judge can get the perspective of the trial, some mistakes may occur, but these should be disregarded if it can be seen that the case was correctly decided and that, even if they had not been made, the same result would have been reached. Justice can be attained without infallibility.

One of the English rules provides:

"A new trial shall not be granted on the ground of the misdirection of the jury or of the improper admission or rejection of evidence, unless in the opinion of the court to which the application is made, some substantial wrong or miscarriage of justice has been thereby occasioned on the trial."

Were such a rule in force here, even assuming that defendant's contentions are correct, the court would be unable to say that substantial wrong has been done the defendant. In several instances the alleged error was subsequently corrected and the excluded evidence supplied.

The granting of a new trial is often a denial of justice, witnesses die or remove beyond the jurisdiction of the court and the resources of the litigants become exhausted.

Believing as we do that the libel here was without justification or excuse and that the verdict was not excessive, we should hesitate long before requiring the plaintiff to begin anew the weary pilgrimage through the courts.

The judgment is affirmed with costs.